**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

DAVID HARRINGTON,

                              Plaintiff,

        v.                                                    No. 09-CV-85
                                                                 (TJM/DRH)
MID-STATE CORRECTIONAL FACILITY;
WILLIAM HULIHAN, Superintendent, Mid-
State Correctional Facility; SALVANA,
Medical Doctor, Mid-State Correctional
Facility; ROWICK, Nurse, Mid-State
Correctional Facility; FERGUSON, Nurse
Practitioner, Mid-State Correctional Facility;
NURSE HOWARD, Registered Nurse, Mid-
State Correctional Facility; BAXTER,
Registered Nurse, Mid-State Correctional
Facility; DR. MANNAVA, Medical Doctor;
DR. REMANINI, Medical Doctor; WAYNE
VISALLI, Nurse; DR. TINA MAXIAN; and
NURSE WILLIAMS,

                              Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

DAVID HARRINGTON
Plaintiff Pro Se
01-A-4591
Mid-State Correctional Facility
Post Office Box 2500
Marcy, New York 13403

HON. ANDREW M. CUOMO                ROGER W. KINSEY, ESQ.
Attorney General for the                   Assistant Attorney General
    State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

Plaintiff pro se David Harrington ("Harrington"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that Mid-State Correctional facility, its Superintendent, and eleven DOCS employees, violated his constitutional rights under the First and Eighth Amendments, and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.. Am. Compl. (Dkt. No. 10). Presently pending is defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. No. 25. Harrington opposes the motion. Dkt. No. 31. For the following reasons, it is recommended that defendant's motion be granted in part and denied in part.

## I. Background

The facts are related herein in the light most favorable to Harrington as the non-moving party. See Ertman v. United States, 165 F.3d 204, 206 (2d Cir.1999). All events occurred when Harrington was incarcerated at Mid-State Correctional Facility ("Mid-State"). Am. Compl. ¶ 10. Harrington states he "suffers disabilities that cause him functional limitations . . . ." Id. ¶ 11.

On July 25, 2005, Harrington underwent an MRI which revealed disc degeneration and disc bulging in his cervical spine. Am. Compl. ¶ 12. On August 25, 2005, after suffering with severe pain for a month, Harrington was examined by defendant Dr. Salvana in the infirmary. Id. ¶ 13. During the appointment, Harrington expressed his feelings of immense

---

[1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

pain yet Dr. Salvana refused to treat him.  Id.  ¶ 14.  Instead, he referred Harrington to a neurologist.  Id.  ¶ 15.  After suffering another four weeks of pain, Harrington was transported to an outside hospital in Syracuse on September 16, 2005 for diagnostic testing and physical therapy. Id. ¶ 16.  On October 6, 2005, Harrington was again seen at the infirmary by Dr. Salvana who discussed with him the neurologist's report and recommendations. Id. ¶ 17.  While Dr. Salvana ordered the follow-up tests recommended by the neurologist, he still refused to provide Harrington with any pain medication.  Id.

On October 27, 2005, Harrington was examined by defendant Rowick, a nurse, regarding his epilepsy.  Am. Compl. ¶ 18.  During the examination Harrington told her that he was still suffering from severe pain yet had received no pain medication.  Id.  Rowick acknowledged Harrington's pain, but explained there was nothing she could do to change the situation.  Id.

On November 9, 2005, Harrington visited the infirmary still complaining of extreme pain. Am. Compl. ¶ 19.  Harrington was examined by defendant Ferguson, a nurse practitioner, who informed Harrington "that Dr. Salvana had been transferred to another facility."  Id. During the examination, Harrington informed Ferguson that he was suffering from extreme pain, numbness, and seizures.  Id.  ¶ 20.  Ferguson gave Harrington ibuprofen.  Id.  Two weeks later, Harrington requested another examination to follow-up with Ferguson, as Harrington had previously been advised that he would have a subsequent appointment with her a few days after November 9.  Id. ¶ 21.  Harrington did not receive the promised follow-up examination and had continued to suffer increasing numbness in his arm.  Id. Harrington reported all of this to defendant Visalli, a nurse, but Visalli failed to record it in his record.  Id.  Visalli also informed Harrington that he was scheduled for physical therapy and

3

that he could do nothing to relieve Harrington's pain.  Id. ¶ 22.

Harrington continued to suffer from severe pain and was never summoned for physical therapy, so he filed a grievance against the entire Mid-State medical staff.  Am. Compl. ¶ 23.  In response to his grievance, the nurse administrator of Mid-State falsely told the grievance supervisor that Harrington had refused his outside medical trips for diagnostic testing.  Id.  Harrington never signed any refusal forms and maintains that the medical staff "sabotaged [his] outside medical trip . . . [so that he] would not have the test results that the prior neurologists had requested . . . [for his] next visit with her so that she [could] properly care for [Harrington's] injury."  Id. ¶ 26.  The diagnostic tests requested by the neurologist were not completed.  Id.

On December 7, 2005, Harrington was again examined by Ferguson who informed Harrington that DOCS headquarters, in Albany, had denied the medical department's requests for the diagnostic testing requested by the neurologist.  Am. Compl. ¶¶ 27-28. During the visit, Harrington told Ferguson "about the numbness in his arms [and] fingers, change in [his] bladder and bowel movements, constant urinating, [and] blood in [his] bowel movements . . . ."  Id. ¶ 28.  Ferguson explained that all she could do was attempt to reorder the previously denied diagnostic test and provide Harrington with ibuprofen for his pain.  Id.

On December 9, 2005, Harrington was taken back to the neurologist for a follow-up visit, without undergoing any of the requested additional diagnostic tests.  Am. Compl. ¶ 32. Thus, the neurologist could not treat Harrington and again requested that the tests be administered.  Id.  The neurologist also requested that DOCS provide Harrington with physical therapy to strengthen his muscles before he was going to be evaluated by "spine

4

clinic surgeons." Id. ¶ 33.  Harrington attended physical therapy on December 14, 16, 21, and 23 and was provided with a lower back brace.  Id. ¶¶ 34-36.

On December 25, 2005, Harrington further injured his back and began enduring even more excruciating pain and difficulty ambulating, resting, and taking deep breaths.  Am. Compl. ¶ 37.  On December 28, Harrington returned to physical therapy and during the evening following the session felt an exacerbation of pain throughout his right side.  Id. ¶¶ 38-39.  The following day, Harrington requested an examination to inform medical of his increased pain and suffering.  Id. ¶ 40.  Harrington was told nothing could be done until he was seen by Ferguson, which would be occurring soon.  Id. ¶¶ 40-41.  Harrington was never called to see Ferguson.  Id. ¶ 42.

On December 30, 2005, Harrington went to physical therapy and informed the therapist that he was suffering from extreme pain.  Am. Compl. ¶ 43.  The therapist recorded that Harrington's "back [wa]s unstable and that [Harrington] need[ed] to see a spine specialist." Id. ¶ 44.  A few days later, Harrington requested emergency treatment as he was suffering from the flu.  Id. ¶ 45.  During that examination Harrington informed defendant Howard, a registered nurse, that he was still suffering from extreme back pain and he had yet to see Ferguson to follow-up.  Id. ¶ 46.  Howard told Harrington that he had been scheduled to see Ferguson until the medical department discovered Harrington's grievance filed against the department, and then his appointment was canceled.  Id. ¶ 47.

On January 4, 2006, while in severe pain, Harrington was sent to physical therapy.  Am. Compl. ¶ 49.  The following day, Harrington saw Howard, complaining of pain.  Id. ¶ 50. Howard was very rude to Harrington and refused to offer him any additional help.  Id.  On January 7, 2006, Harrington signed a consent form for the diagnostic testing he required

pursuant to the neurologist's recommendations.  Id. ¶ 51.  Harrington continued to go to physical therapy, attending sessions on January 11, 18, and 20 and being told that he was to be referred to a back specialist for further evaluation.  Id. ¶ 52.

On February 3, 2006, Harrington was examined by defendant Dr. Maxian at Walsh Regional Medical Unit ("RMU").  Am. Compl. ¶ 53.  Dr. Maxian recommended Harrington see a spine specialist to see if he was an appropriate surgical candidate.  Id.  On February 21, 2006, Harrington requested an examination to tell medical staff he was still in pain and check to see when his referrals were going to occur.  Id. ¶ 55.  Ferguson informed Harrington that she could not help him with his pain relief for his back and elbow and that he was not scheduled for a specialist visit until next month.  Id.  However, Ferguson did renew Harrington's back brace permit and told him that she would order a prescription for pain medication.  Id. ¶¶ 55-56.  Harrington never received any medication from that prescription. Id. ¶ 56.

On March 3, 2006, Harrington returned to the neurologist.  Am. Compl. ¶ 57[2].  The neurologist recommended that Harrington be examined by a spinal clinic and requested recent blood samples from Harrington because his last test results showed elevated levels. Id.  On March 6, 2006, Harrington was examined by Ferguson who gave him an elbow brace and informed him that his spine specialist appointment would occur in April.  Id. ¶ 58. Additionally, Harrington received physical therapy on March 24, April 13, and April 20. Id. ¶¶ 59-60.  On April 21, 2006, Harrington was evaluated by the spine specialist.  Id. ¶ 62.

---

[2] Harrington's amended complaint has two paragraphs numbered 57.  See Am. Compl.  This citation is to the second paragraph which was entered.  The subsequent numbers have not been disturbed.

6

Harrington contends Ferguson and Dr. Maxian "deliberately withh[e]ld [Harrington's] medical records, M.R.I. reports and the necessary records to enable the spinal specialist to thoroughly examine [Harrington thus he] . . . was deprived of an opportunity to be properly treated by the spinal doctor . . . ." Id. ¶ 63.  Harrington's feelings were confirmed when he was sent to an orthopaedic specialist on May 3, 2006, who indicated that Harrington needed to be seen by a spine specialist.  Id. ¶ 65.

On May 31, 2006, Harrington had various radiology films taken, being informed by medical staff that his "films were never returned by the neurologists, in an attempt to conspire . . . to coverup . . . wrongdoings [because t]he neurologist showed [Harrington] that none of his . . . films or reports had been sent when [Harrington] last visited the neurologist." Am. Compl. ¶ 67.  On June 6, 2006, Ferguson told Harrington that medical staff was attempting to locate his chart as it had been misplaced.  Id. ¶ 68.  Harrington continued experiencing extreme pain in his back and legs.  Id. ¶ 70.

On July 7, 2006, Harrington was evaluated by a spinal specialist.  Am. Compl.  ¶ 71. However, Harrington's radiology films were not sent with him to the appointment so the specialist again could not adequately treat or diagnose Harrington.  Id.  Harrington then experienced repeated falls in the mess hall due to a floor condition about which he apprised unnamed third parties. Id. ¶¶ 74-75.  After the second fall, Harrington was taken to the infirmary for injuring his lower back, and Ferguson refused to treat him.  Id. ¶ 76.  Dr. Mannava provided Harrington with only Tylenol, despite the severity of his injury.  Id. ¶ 77. Harrington returned to the infirmary a few days later and was told by Ferguson that there was still nothing she could do and Harrington would have to wait two months before he was able to see the neurologist again.  Id. ¶ 79.

On October 6, 2006, Harrington went to see the neurologist who ordered pain medication for Harrington.  Am. Compl. ¶ 80.  Later that month, Harrington fell in the mess hall again and injured his knee, wrist, ribs, and back.  Id. ¶¶ 81-82.  On November 29, 2006, Harrington was told by the medical staff that there was nothing they could do and he needed to wait and speak with Ferguson to see if there was any treatment available.  Id. ¶ 84.  On December 6, 2006, Harrington spoke with Ferguson about his recent medical issues and Ferguson indicated that there was nothing she could do for him.  Id. ¶ 85.  On January 12, 2007, Harrington returned to the spinal clinic and told them about his recent injuries.  Id. ¶¶ 86-87.  Harrington stated that the specialist completed a cursory examination which was not helpful with the diagnosis or treatment of Harrington's pain.  Id. ¶ 87.  On February 15, 2007, Harrington was examined by a pain clinic in Syracuse.  Id. ¶ 89.

Additionally, Harrington began attending physical therapy again, attending sessions February 20, 23, and 26, and March 2, 5, and 7.  Am. Compl. ¶¶ 93-94.  After each session, Harrington experienced immense pain.  Id. ¶ 94.  On March 12, 2007, Harrington received an epidural to attempt to relieve his back pain.  Id. ¶ 95.  On March 20, 2007, Harrington felt a crawling sensation on his legs, and continued to experience severe pain.  Id. ¶ 96.  This pain persisted for a week and was also accompanied by tingling and numbness at his extremities.  Id. ¶ 97.  Ferguson explained to Harrington that these were normal side effects.  Id.  The following day, when Harrington arrived at physical therapy, the therapist called Ferguson to complain about the exacerbation of Harrington's injuries.  Id. ¶ 98-99.

On March 27, 2007, Harrington was examined by Dr. Mannava who ordered the epidurals and therapy to continue.  Am. Compl. ¶ 100.  Harrington went to two more

physical therapy sessions, on March 30 and April 2, and was in so much pain that his ability to participate in the session was limited.  Id. ¶ 101.  On April 9, 2007, Harrington received his second epidural.  Id. ¶ 102.  On April 12, 2007, Harrington was summoned to see Ferguson and she changed one of Harrington's medications.  Id. ¶ 104.  At or about that same time, DOCS denied requests for Harrington to receive further treatment at the pain clinic, despite his continued complaints.  Id. ¶ 105.

On July 6, 2007, Harrington returned to the spine clinic and was told "that there was a strong likelihood or a 75% [chance] of exacerbating his current condition if they were to operate."  Am. Compl. ¶ 109.  In December 2007, Harrington's back continued to cause him severe pain. Id. ¶¶ 113-15.  On December 11, 2007, Harrington went to the infirmary where he was informed by Howard that she did not care who Harrington had made an appointment with, the appointment had been cancelled, Howard refused to provide him with pain relief, and she ordered him to return to his cell.  Id. ¶ 115.  On December 13, 2007, Harrington was examined by Dr. Mannava for complaints of right side pain and numbness, and Dr. Mannava refused to provide him pain medication or an assistive device to alleviate Harrington's discomfort.  Id. ¶ 116.

Harrington returned to the pain clinic on December 20, 2007 and was recommended to receive shots of pain medication.  Am. Compl. ¶ 117.  However, Dr. Mannava refused to fill the prescription because he claimed the pain specialist was incompetent in rendering Harrington's care.  Id. ¶¶ 117-20, 122.  Defendant Dr. Remanini agreed with Dr. Mannava's assessment, stating that the pain medication was "[un]necessary, and that [Harrington should stop complaining and tough it out."  Id. ¶ 122.  Dr. Mannava also refused Harrington's request to renew his back brace permit.  Id. ¶ 123.  On February 12, 2009,

9

Harrington was again examined in continued pain in his hips, leg, and back. Id. 125. During the examination, Harrington was advised that Dr. Remineni would not treat Harrington because the complaints Harrington had lodged against the staff were severely aggravating the doctor. Id. ¶ 126. On March 6, 2009, Harrington was summoned to see Dr. Remanini who told him that he "d[id] not have a back problem or nerve damage . . . ." Id. ¶ 127. Additionally, Dr. Remanini instructed Harrington to take a pain reliever, stretch, and exercise. Id. ¶¶ 127-28. This action followed.

## II. Discussion

Liberally construing the amended complaint, Harrington claims that his First Amendment rights were violated when defendants failed to provide him with appropriate medical treatment in retaliation for his filing of grievances.[3] Additionally, Harrington claims that his Eighth Amendment rights were violated when defendants were deliberately indifferent to his serious medical needs. Lastly, Harrington claims defendants failed to provide him with appropriate accommodations for his disabilities in contravention of the ADA. Defendants move for dismissal contending that (1) Harrington's claims are barred by the statute of

_____

[3] In order to state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996). Harrington alleges that after the medical staff discovered he was lodging grievances and complaints against them, they refused to provide him with medical treatment. Liberally construing the complaint, and viewing the facts in the light most favorable to Harrington, Harrington has established a claim with respect to defendants Ferguson, Howard, Mannava, and Remanini. Plausible retaliation was demonstrated because filing grievances is an act protected by the constitution and preclusion from medical treatment subsequent to, and because of, those filings is an appropriate statement of an adverse action. Defendants do not address this issue and, thus it will not be further discussed in the present motion.

limitations, (2) his constitutional and ADA claims are meritless, (3) Harrington has failed to

exhaust his claims, (4) various parties are barred from suit due to the Eleventh Amendment[4]

and ADA, (5) defendant Hulihan's personal involvement has not been established, and (6)

defendants are entitled to qualified immunity.


### A. Legal Standard

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim.  When

considering a motion to dismiss, "a court must accept the allegations contained in the

complaint as true, and draw all reasonable inferences in favor of the non-movant."

Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  However, this "tenet . . . is

inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of

action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 129 S.

Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007)

(holding that "entitlement to relief requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action . . . [as] courts are not bound to

accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility . . .

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556 (explaining

that the plausibility test "does not impose a probability requirement . . . it simply calls for

---

[4] In his opposition papers Harrington clarified that he was suing defendants "in their individual capacity."  Dkt. No. 31 ¶ 5.  Therefore, defendants' Eleventh Amendment claims need not be further discussed as Harrington has conceded that he is not suing any of the defendants in his or her official capacity.

enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . . . .") (citations omitted).  Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 129 S. Ct. at 1950-51.

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006); see also Sealed Plaintiff v. Sealed Defendant # 1, 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

## B. Statute of Limitations

Defendants move to dismiss Harrington's allegations concerning inadequate treatment for his back pain, occurring prior to January 2006, on the ground that those claims are barred by the statute of limitations.  While there is no provision in § 1983, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law.  42 U.S.C. § 1988(a) (2003); Moor v. County of Alameda, 411 U.S. 693, 702-03 (1973).  In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. See Owens v. Okure, 488 U.S. 235, 249-51 (1989); Romer v. Leary, 425 F.2d 186, 187 (2d Cir. 1970); N.Y. C.P.L.R. 214(2)

12

(McKinney 2003).

Federal law governs the determination of the accrual date for purposes of a § 1983 claim.  Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002).  The claim accrues "when the plaintiff knows or has reason to know" of the harm.  Id. (citations omitted).  "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." Singleton v. City of New York, 632 F.2d 185, 192 (2d Cir. 1980).  With regard to medical indifference claims, the statute of limitations in a § 1983 suit is derived from personal injury case law, not medical malpractice.  See e.g. Owens, 488 U.S. at 251.  Additionally, "a pro se prisoner's § 1983 complaint is deemed filed, for statute of limitations purposes, when it is delivered to prison officials." Tapia-Ortiz v. Doe, 171 F.3d 150, 152 (2d Cir. 1999) (citing Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993); Houston v. Lack, 487 U.S. 266, 270 (1988)).

Here, Harrington's initial complaint was filed with the Court on January 26, 2009, but it was signed under oath on July 10, 2008.  See Dkt. No. 1 at 29.  There has been no contention as to when the documents were delivered to prison authorities, but in construing the facts in the light most favorable to Harrington, it is presumed they were delivered the same day on which the document was notarized.  Giving deference to the fact that "[t]he prisoner simply has no control over the processing of his complaint . . . ." the date for statute of limitations purposes will remain July 10, 2008.  Dory, 999 F.2d at 682.  Therefore, all claims occurring on or after July 10, 2005 are included within the present claim.  As Harrington's complaints and alleged constitutional violations began on July 25, 2005, all of his allegations are within the proscribed time period.  Accordingly, the statute of limitations does not bar any of Harrington's claims.

13

Therefore, defendants' motion on this ground should be denied.

## C. Failure to Exhaust

Under 42 U.S.C. § 1997e(a), an inmate must exhaust all administrative remedies prior to bringing any suits challenging prison conditions, including federal civil rights cases. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 83 (2006).  This exhaustion requirement applies to all prison condition claims.  Porter, 534 U.S. at 532.  "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement."  Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate.  Nussle, 534 U.S. at 524.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply."  Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citing Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004)).  Exhaustion for an inmate in DOCS custody is generally achieved through the Inmate Grievance Program (IGP).[5]  See N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1, et seq..  However, when inmates fail to follow the IGP, a court must conduct a three-part inquiry to determine if such failure is fatal to their claims.  A court must consider whether

───────────────

[5]"The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

14

> (1) administrative remedies are not available to the prisoner; (2) defendants
> have either waived the defense of failure to exhaust or acted in such a way as
> to estop them from raising the defense; or (3) special circumstances, such as
> a reasonable misunderstanding of the grievance procedures, justify the
> prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)).

Administrative remedies are unavailable when there is no "possibility of [] relief for the action complained of." Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004) (citing Booth v. Churner, 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. Id. at 688.

In this case, Harrington has established sufficient facts to show he plausibly utilized the IGP concerning at least some of his medical complaints. Sometime between November and December 2005, Harrington stated that he filed a grievance against the Mid-State infirmary, including the present defendants, alleging that they were failing to treat his pain adequately and provide him with his prescribed physical therapy. Am. Compl. ¶ 23. Harrington claims the medical staff lied in retaliation, claiming he failed to consent to any outside trips, yet Harrington stated that no refusal forms were ever signed and on December 5, 2005 the "Grievance Supervisor . . . revealed that [the] Nurse Administrator had been untruthful . . . ." Id. ¶¶ 23-24. Construing the facts in the light most favorable to Harrington, it appears that he filed a complaint or grievance about his treatment and pursued it until he was vindicated. This belies defendants' claims of a failure to exhaust or utilize the grievance and appeals procedures. Reference to the filing of grievances and complaints were also made other times throughout the body of the amended complaint. Id. ¶¶ 47, 126. Thus, based solely on a review of the amended complaint, it appears that

15

Harrington did comply with the administrative exhaustion requirements.

Accordingly, defendants' motion on that ground should be denied.


### D. Eleventh Amendment

While Harrington has made it clear that he is suing the individual defendants in their individual capacities, he is also suing Mid-State Correctional Facility.  Defendants argue "[t]o the extent that [Harrington] . . . purports to subject either the State of New York or its agencies to the jurisdiction of this court . . . the Eleventh Amendment bars such action . . . ." Defs. Mem. of Law (Dkt. No. 25-1) at 20 (citations omitted).

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State."  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) (citing Hans v. Louisiana, 134 U.S. 1, 21 (1890)).  Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment.  Halderman, 465 U.S. at 100.  Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See Quern v. Jordan, 440 U.S. 332, 340-41 (1979).

Therefore, Harrington's claims against the Mid-State Correctional Facility are expressly barred by the Eleventh Amendment.  See Bryant v. New York State Dep't of Corr. Servs.

16

Albany, 146 F. Supp. 2d 422, 425 (S.D.N.Y. 2001) ("State agencies, such as DOCS, serve

as an arm of the state and are, similarly, entitled to Eleventh Amendment immunity.")

(citations omitted).  Thus, the Eleventh Amendment bar applies and serves to prohibit

Harrington's claims against the correctional facility.

Accordingly, it is recommended that defendants' motion on this ground be granted as to

Mid-State.


## E. ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of . . . a public

entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Title II

applies to state inmates.  Docket No. 34; Giraldi v. Bd. of Parole, No. 04-CV-877

(FJS/DRH), 2008 WL 907321, at *5 (N.D.N.Y. Mar. 31, 2008).  To state a claim under the

ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being
> excluded from participation in, or being denied the benefits of some service,
> program, or activity by reason of his or her disability; and (3) [the facility that]
> provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

As to the first element. person is an individual with a qualified disability if "(A) a physical

or mental impairment . . . substantially limits one or more of the major life activities of such

individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being

regarded as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C).  If a plaintiff fails to

identify the specific activity limited by the impairment and fails to allege that it constitutes a

17

major life activity, the ADA claim must be dismissed.  Reeves v. Johnson Controls World Servs., 140 F.3d 144, 153-54 (2d Cir.1998).

First, a claim under the ADA cannot be brought against individuals and, therefore, the claims against the individual defendants under the ADA must be dismissed.  See Fox v. State University of New York, 497 F. Supp. 2d 446, 451 (E.D.N.Y. 2007); Hallet v. New York State Dep't of Corr. Serv., 109 F. Supp. 2d. 190, 199 (S.D.N.Y. 2000).  Second, Harrington has proffered no evidence to establish the first element of his claim.  Harrington characterizes his medical problems in the complaint, though he fails to allege any facts indicating how his back pain has substantially limited his life activities.[6]  As Harrington has failed to identify such a limitation, his claim must be dismissed.  Reeves, 140 F.3d at 153-54.  Additionally, the basis of Harrington's claims of denial of benefits revolves around his medical treatment.  However, such complaints concerning medical treatment are insufficient to state a claim under the ADA.  See United States v. Univ. Hosp., 729 F. 2d 144, 156-60 (2d Cir. 1984).

Accordingly, defendants' motion as to the ADA claim should be granted on this ground.

### F. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  This prohibition extends to the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is

---

[6] In his opposition papers, Harrington states that he has "a disability to stand for extended periods of time and an inability to walk for distances . . . ."  Dkt. No. 31 ¶ 33.  However, those claims are still non-specific and nothing within his amended complaint indicated that he could not ambulate effectively anymore.

twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994).  Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

   "'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

   Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long

as the treatment was adequate.  Chance, 143 F.3d at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a section 1983 claim."  Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

    In this case, Harrington alleges that he suffered a myriad of illnesses and ailments.  However, the one that he continually refers to in all medical appointments, regardless of the initial reason for his visit, was the chronic and persistent pain and numbness in his back and right side.  Such pain, viewing the facts in the light most favorable to Harrington, plausibly establishes a serious medical need.  See Sereika v. Patel, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006) (holding that a shoulder injury which resulted in "great discomfort and pain . . . [and a] los[s of] a great deal of mobility . . . ." was sufficient to raise a question of fact as to whether the injury constituted a serious medical need, precluding dismissal).  It is undisputed that Harrington saw medical staff on multiple occasions about his pain and that these visits resulted in multiple referrals to specialists and a pain clinic.  Additionally, Harrington's condition warranted multiple diagnostic and radiology studies.  Thus, the condition was serious enough to result in referrals to specialists and the pain was great enough to involve an outside pain management clinic.  Accordingly, Harrington has successfully pled facts to plausibly establish the objective element of the analysis.


### 1. Drs. Salvana and Maxian and Rowick, Visalli, and Meyers

    Harrington claims that all defendants were deliberately indifferent to his medical needs because they did not provide him with adequate pain relievers.  Although Dr. Salvana did not prescribe pain medication for Harrington, he did refer him to a neurologist presumably to

discover the cause for Harrington's unrelenting pain.  Am. Compl. ¶¶ 14-15.  Harrington saw

Salvana one last time, after an appointment with the neurologist and attended physical

therapy in the interim, where he again was not provided with pain medication but was

advised of the neurologist's report and recommendation and given orders to have additional

follow-up diagnostic testing performed.  Id.  ¶ 16.  Dr. Salvana's actions of referring

Harrington's care to a specialist, more familiar with the intricacies of Harrington's subjective

symptoms, belies any claims of deliberate indifference.  Referring for specialist care,

explaining the specialist's findings, and referring for further diagnostic follow-up are all

appropriate treatment actions.   See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)

("The Constitution does not command that inmates be given the kind of medical attention

that judges would wish to have for themselves.  The essential test is one of medical

necessity and not one simply of desirability.") (internal quotation marks and citations

omitted).  Thus, Harrington's conclusory allegations fail to state that Dr. Salvana acted with

deliberate indifference.

    Similarly, when Harrington was examined once by Rowick, he complained of pain, which

she acknowledged and then stated that she had no authority to do anything to change

Harrington's situation.  Am. Compl. ¶ 18.  Such a statement does not illustrate an intentional

denial or delay of treatment.  Rowick treated Harrington to the extent that she could.

Whether she should have done more, such as make some type of arrangements for

different pain management, is nothing more than a difference in opinion as to treatment.

Such differences are not cognizable to state a constitutional claim.  Sonds, 151 F. Supp. 2d

at 312.  This single encounter was, at worst, an instance of negligence on Rowick's behalf.

However, such contentions are still insufficient to support an Eighth Amendment claim.

See Estelle , 429 U.S. at 107.  Negligence is insufficient to establish deliberate indifference.

Id. at 106 ("Medical malpractice does not become a constitutional violation merely because

the victim is a prisoner.").

Defendant Visalli also only provided Harrington with treatment on one occasion.  Am.

Compl. ¶ 21.  On that day, Visalli failed to record all of Harrington's complaints of pain and

numbness in his medical record.  Id.   Harrington fails to allege, and the record does not

support, any contentions that this omission was intentional or deliberate.  Decisions as to

what history is pertinent to record are arguably decisions of medical judgment.  Poor

medical judgement results in, at worst, an instance of medical malpractice.  See Estelle ,

429 U.S. at 107.  As previously discussed, such contentions are insufficient because

allegations of negligent behavior do not rise to the level of deliberate indifference.  Id. at

106 ("Medical malpractice does not become a constitutional violation merely because the

victim is a prisoner.").  Visalli also told Harrington that he was scheduled for physical

therapy and that he could not do anything to alleviate his pain.  Am. Compl. ¶ 22.  There is

nothing in the record to infer that Visalli had control over either Harrington's physical therapy

schedule or pain management regimen.  To the extent Visalli did, differences in opinion as

to how quickly Harrington should have received those services are also insufficient to state

an Eighth Amendment claim.  Sonds, 151 F. Supp. 2d at 312.

Dr. Maxian was located at a different facility, Walsh RMU, than where Harrington

received the majority of his alleged unconstitutional treatment.  Am. Compl. ¶ 53.  Dr.

Maxian only saw Harrington once, in February 2006, approximately a month after

Harrington was told that Mid-State medical staff were upset with the grievances that he

filed.  Id.  ¶¶ 47, 53.  Dr. Maxian is accused of not sending Harrington's radiology films with

22

him to the specialist whom Dr. Maxian recommended Harrington see.  Am. Compl. ¶ 63.

However, Harrington did not go to his specialist visit, without his medical records, until April

2006.  Id.  ¶ 62.  That was three months later.  Also, Harrington and Dr. Maxian had no

contact after February and Dr. Maxian was not in the facility that housed Harrington, and

has not been alleged to have access to or authority over his medical record which was sent

to the specialist appointment.  Thus, there is nothing in the record to indicate that Dr.

Maxian deliberately withheld anything.  Actually, such contentions are belied by Dr.

Maxian's actions since he recommended Harrington be seen by the specialist.  Additionally,

unlike the other defendants below, there is no animosity between Dr. Maxian and

Harrington, as Harrington's complaints were at Mid-State and not Walsh RMU, which might

serve as a basis to conclude knowing disregard for Harrington's health and safety.

Harrington's only contact with defendant Myers was during an examination when she

indicated that Dr. Remineni would no longer treat Harrington due to the continued

complaints he had lodged against him.  Am. Compl. ¶ 126.  These allegations do not

indicate that Meyers intentionally denied or delayed treatment.  All they determine is that

Harrington was not going to be treated by another individual.  As evidenced by Harrington's

own version of the events, Meyers did perform an examination which belies any suggestion

that she failed to treat him.[7]

Accordingly, the amended complaint fails to allege facts sufficient to conclude that Drs.

Salvana and Maxian and Rowick, Visalli, Meyers, Baxter, and Williams  were deliberately

indifferent in Harrington's care and defendants' motion, as it pertains to them, should be

---

[7] Harrington has failed to proffer any specific allegations against defendants Baxter
and Williams.

granted.

## 2. Ferguson, Howard, and Drs. Mannava, and Remanini

Ferguson met with Harrington at least ten times throughout the relevant time period at Mid-State.  Initially, Ferguson adequately treated Harrington, providing him with ibuprofen on multiple occasions, providing him with a back and elbow brace, arranging for radiology appointments, and explaining that treatment appeared to be delayed due to instructions from DOCS in Albany and not by actions of any of the named defendants.  Am. Compl. ¶¶ 20, 28, 55-56, 58.  However, viewing the allegations in the amended complaint in the light most favorable to Harrington, the record shows that her attitude towards Harrington began to change, with her failing to see Harrington and, when she did, continually stating there was nothing she could do and refusing to provide him with any pain medication.  Id.  ¶ 40-42, 55

Additionally, Harrington was informed that due to his complaints, his appointments with Ferguson were being cancelled.  Id.  ¶ 47.  Shortly after this statement, Harrington was sent to a specialist, but his medical record and radiology reports were not, so the specialist could not examine Harrington and the visit was unproductive.  Id.  ¶¶ 62-63.  Harrington was told by the medical staff that his chart had been lost, or not returned from a previous visit to a different specialist, though he contends this was false.  Id.  ¶ 68.  This was the second time that something of this magnitude had happened to Harrington.  The first also occurred while he was under the care of Ferguson, when the medical department failed to order and receive specific diagnostic results which were requested by Harrington's neurologist.  Id.  ¶ 26.  The fact that these tests were never completed and that the medical department failed

to send Harrington's medical records with him to a second specialist's appointment indicates intentional delay.  The second instance in particular is bolstered by the fact that the records were unavailable shortly after Harrington heard that Ferguson was refusing to see him for treatment due to the complaints he had lodged.  As Ferguson was in charge of his care, such a delay is reasonably attributed to her.

Moreover, Ferguson completely dismissed Harrington's complaints of pain and extreme adverse side effects to his epidural medication.  Id.  ¶ 97.  Ferguson stated that these effects were normal, and maintained that position in spite of Harrington's therapist calling her to complain about the exacerbation of Harrington's injury and condition.  Id.  ¶¶ 98-99.  Continuing with the epidurals represents a deliberate action in the face of a known risk and harm, as identified by Harrington's physical therapist upon Harrington's return to therapy after his first injection.  Accordingly, Harrington has raised facts to illustrate that Ferguson was deliberately indifferent to his continuing care.

Howard was the treating nurse who informed Harrington that his complaints against the medical staff had resulted in his appointments being cancelled.  Am. Compl. ¶ 47.  As stated above, with defendant Meyers, delivering that message, without more, is insufficient to establish intentional delay or denial of treatment.  However, viewing the allegations of the amended complaint in the light most favorable to Harrington, in Howard's subsequent dealings with Harrington, it is clear that she was intentionally failing to provide him with treatment by being rude and refusing to offer him any medical assistance.  Id.  ¶ 50.  This animosity escalated to the point that Howard directly informed Harrington that she did not care who he was trying to make an appointment with, it had been cancelled, and she refused to provide him with any treatment or attention for his pain, sending him back to his

cell.  Id.  ¶ 115.  Viewing these facts in the light most favorable to Harrington, it is clear that

Howard was deliberately refusing to participate in his care and was also intentionally

denying and delaying the provision of care by refusing to allow Harrington to make an

appointment or see another health care professional.

Harrington began receiving treatment from Drs. Mannava and Remanini after he was

also informed by Howard that the medical department was frustrated with his complaints.

Dr. Mannava was responsible for ordering the continuation of Harrington's epidurals and

physical therapy.  Am. Compl. ¶ 100.  As previously discussed with respect to Ferguson, the

continuation of these treatments represents intentional disregard for Harrington's health

because it had been indicated to his treatment team that these shots were worsening his

condition.  Id.  ¶¶ 98-99.

After the shots continued to worsen Harrington's condition, Dr. Mannava completely

changed his course of treatment and provided Harrington with no pain medication or

treatment, despite his increased complaints of pain, tingling, and numbness.  Id.  ¶ 116.  In

fact, Dr. Mannava went one step further, refusing to fill Harrington's prescriptions from the

pain clinic to which he had previously been referred because Dr. Mannava felt those

physicians were incompetent and Harrington needed to "stop complaining and tough it out".

Id.  ¶¶ 117-20, 122.  Such extremes in treatment, especially in light of a common feeling of

anger towards Harrington for the complaints he had filed, indicates a knowing disregard for

Harrington's health and safety which transcends the boundaries of mere disagreements in

treatment.

Lastly, Dr. Remanini's actions also indicate that he intentionally denied Harrington

treatment by failing provide him with any care at all.  Dr. Remanini's consultation began with

agreeing with Dr. Mannava's assessment that there was nothing wrong with Harrington's back and therefore no true cause for all the pain he was complaining about.  Id.  ¶ 122.  The assessment, in isolation, appears to be a medical judgment to which disagreements are insufficient to state an actionable basis for a constitutional claim.  Sonds, 151 F. Supp. 2d at 312.  However, such contentions are belied by the fact that, shortly thereafter, Dr. Remanini expressed to Meyers his intention not to treat Harrington at all because of his propensity to constantly file complaints.  Am. Compl. ¶ 126.  Such statements could have motivated Dr. Remanini's subsequent actions of informing Harrington that he had no back problem at all and that Harrington's only course of action was to take over-the-counter pain relievers, stretch, and exercise.  Id.  ¶¶ 127-28.  Viewing the facts in the light most favorable to Harrington, Dr. Remanini's consistent decision to refuse to acknowledge or treat Harrington's pain was motivated by his deliberate indifference.

Accordingly, viewing the allegations in the amended complaint in the light most favorable to Harrington, sufficient facts are alleged from which to find that Ferguson, Howard, and Drs. Mannava and Remanini were deliberately indifferent in Harrington's care and defendants' motion, as it pertains to them, should be denied.


### G. Personal Involvement

Defendants contend that Harrington has failed to establish defendant Hulihan's personal involvement.

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d

Cir. 1994) (quoting <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

supervisory officials may not be held liable merely because they held a position of authority.

<u>Id.</u>; <u>Black v. Coughlin</u>, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may

be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional
> violation;
>
> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance of
> such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

<u>Colon v. Coughlin</u>, 58 F.3d 865, 873 (2d Cir. 1995) (citing <u>Williams v. Smith</u>, 781 F.2d 319,

323-24 (2d Cir. 1986)).

The gravamen of Harrington's complaint is that Hulihan was a poor supervisor.

However, a position in a hierarchical chain of command, without more, is insufficient to

support a showing of personal involvement.  <u>Wright</u>, 21 F.3d at 501.  Harrington states that

Hulihan "created policies . . . of deliberate indifference . . . failed to properly train

employees, investigate complaints and . . . remedy the act of deliberate indifference . . . ."

Dkt. No. 31 ¶ 34.  Harrington alleges that Hulihan was guilty of not investigating complaints

he received, even though Harrington wrote him letters of complaint.  However, merely

writing letters is insufficient to establish notice and personal involvement.  <u>Smart v. Goord</u>,

441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."). Similarly, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.  See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) (citing cases); Boddie v. Morgenthau, 342 F. Supp. 2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").  Thus, Harrington's allegations that Hulihan was personally involved due to his failure to investigate and act on his letters of complaint are meritless.

Additionally, Harrington's contentions that Hulihan should have interfered with medical treatment decisions is also incorrect.  The Second Circuit has cautioned against such policy making.  See Cuoco v. Moritsugu, 222 F.3d 99, 111 (2d Cir. 2000) (discussing how non-medical personnel do not have authority to intervene in medical decisions because of the poor repercussions which would result "if non-medical personnel were to attempt to dictate the specific medical treatment . . . .").  Other than conclusory allegations of policies of deliberate indifference, Harrington has failed to allege any plausible facts that would lead one to believe that Hulihan was personally involved in the alleged violations.  Moreover, there is nothing to support contentions that he was grossly negligent or failing to remedy ongoing constitutional violations.

Accordingly, defendants' motion on this ground should be granted.

**H. Qualified Immunity**

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights . . . immunity might still be available as a bar to . . . suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights."   Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991) (citations omitted).  A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, as discussed supra, Harrington has demonstrated a deprivation of his Eighth Amendment right by Ferguson, Howard, and Drs. Mannava and Remanini when the evidence is viewed in the light most favorable to Harrington.  It must then be determined whether the right in question was clearly established at the time of the violation.

It has long been held that the Eighth Amendment "requires that inmates be furnished

30

with . . . reasonable safety [and i]t is cruel and unusual punishment to hold convicted

criminals in unsafe conditions."  <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993) (internal

quotation marks and citations omitted).  Thus, the Eighth Amendment right which Harrington

contends was violated by the actions of defendants was clearly established in July 2005

when the events at issue herein transpired.  Accordingly, it is recommended that

defendants' motion on this ground as to Ferguson, Howard, and Drs. Mannava and

Remanini be denied.


### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion to

dismiss (Dkt. No.25) be:

1. **GRANTED** with respect to Harrington's ADA claims and all ADA claims and

defendant Mid-State Correctional Facility be **DISMISSED**;

2. **GRANTED** with respect to Harrington's Eighth Amendment claims against

defendants Salvana, Maxian, Rowick, Visalli, and Meyers and that the amended complaint

bee **DISMISSED WITH PREJUDICE** as to those defendants;

3. **GRANTED** as to defendant Hulihan and that the amended complaint be

**DISMISSED WITH PREJUDICE** as to that defendant; and

4. **DENIED** as to all other defendants and claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen

(14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c)

(citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89

(2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  May 21, 2010
          Albany, New York

United States Magistrate Judge

32